## Commonwealth v. Frengel

*Annette M. Hutchison, Assistant District Attorney*, for the Commonwealth.

*Frank G. Verterano*, for defendant.

CAIAZZA, J., October 20, 1982—Defendant here, Joseph W. Frengel, was arrested for possession with intent to deliver a controlled substance and possession of a controlled drug, both of which are violations of "The Controlled Substance, Drug, Device and Cosmetic Act," the Act of April 14, 1972, P.L. 233, No. 64, §1, *et seq.*

On October 2, 1981, Richard E. Hanna, Chief of Police for the Borough of New Wilmington, Pennsylvania, applied to District Magistrate, Betty Lou Kradel, seeking a search warrant.

In his affidavit detailing probable cause, Chief Hanna stated that he:

Received information regarding unlawful acts that occurred between the hours of 10:30 pm Saturday, September 26, 1981, and 7:00 am Sunday, September 27, 1981. These certain unlawful acts occurred in an off campus fraternity house located on the westside of New Castle Street between Meadowbrook Avenue and Carol Drive and further identified as the Sigma Phi Epsilon Fraternity—New Castle, St., New Wilmington, Pa. Sigma Phi Epsilon is a two and one half story frame dwelling currently used as living quarters for 15 or more students which are members of the fraternity and attend Westminster College.

Chief Hanna stated that the information contained in the affidavit of probable cause was received by him between 7:00 pm and 10:30 pm on Wednesday, September 30, 1981. The source of the information was a female student enrolled in Westminster College who told Chief Hanna that she was raped, sodomized, indecently assaulted and forcibly restrained by numerous members of the Sigma Phi Epsilon Fraternity.

The affidavit continued by the victim relating to Chief Hanna that she arrived at the Sigma Phi Epsilon house at approximately 9:45 pm on September 26, 1981; that she was served beer at a makeshift bar on the first floor; that she became ill and then regurgitated outside the house. She subsequently recalled being on the second floor of the dwelling and smoking marijuana with about six males; at about 1:00 am she became aware of being in a bed on the second floor of the house with several males. The informant continued by relating that the males proceeded to remove her clothing. She protested and subsequently became aware that her wrists and ankles were secured to a bed. It, then, became impossible for her to resist or vacate the premises. She indicated that various forms of sexual behavior were forced upon her and that certain "articles" of her clothing were taken from her and may still be on the premises." *See* p. 1 of affidavit.

The female informant concluded by stating that during one conscious period she heard a male actor state that the "four ludes did a good job." *See* p. 2 of affidavit. Apparently, while she was on the second floor she was also provided with a pipe containing marijuana, which she admitted smoking with the other male actors. The affidavit also contained a statement whereby the victim informed the affiant

that "When the marijuana supply ran low, a new supply was immediately procured from an unknown location on the premises." *See* p. 3 of the affidavit.

Based on this information, the officer requested the issuance of a search warrant for a *complete* search of the Sigma Phi Epsilon Fraternity House for the following items (Emphasis supplied.)

1. Victim's blue bikini style panties; pale blue faded bikini briefs. Blue lace ruffles—torn in struggle.

2. Victim's belt—clear blue plastic— approximately ½ inch holes in belt in shape of heart use to last hole.

3. Blood, hair, or fibers from victim's body or clothing.

4. Marijuana, quaaludes, narcotic, or other illegal drugs.

5. Bed sheets, bed covers in room on second floor where victim was assaulted.

6. Knife, bottle, and hedge clippers used in the commission of the crime. (Emphasis supplied.)

*See* p. 2 of affidavit.

The Sigma Phi Epsilon Fraternity House is located in the Borough of New Wilmington, Pennsylvania. The fraternity house itself has four floors; defendant here lived on the basement floor. Two water beds were physically located in his room, as well as a refrigerator, a hot plate, three chairs, one table, a television set and two closets. The rent for the room per semester was $365. The room was utilized for sleeping, studying, eating and social calls. Upon occasion, he would cook his own meals. For security purposes defendant installed a combination lock on the outside of the door to his room and a latch hook on the inside.

Also, various parts of the fraternity house were used in common; a television room, a dance room, a barroom, and apparently, a kitchen. Bathroom facilities were also used in common with the other fraternity brothers.

The fraternity house itself was owned by the National Sigma Phi Epsilon Fraternity. The residents paid the rent to the chapter president; also, the house was apparently not situated upon property owned by Westminster College. On the date here in issue, approximately 15 fraternity brothers occupied the house, all of whom were registered students at Westminster College, except Mr. Frengel's roomate, Robert Geary. As a consequence, the college had a list of people residing in the fraternity house; however, there were no resources available to the college which could match a particular resident with a particular room; additionally, each room was not numbered for identification.

On the basis of this information contained in the affidavit a search warrant was issued by the magistrate for the entire premises. As a result of the search, various items of tangible evidence were found, which items are specifically described in Exhibits "A-1" and "A-2" of defendant's motion to suppress evidence and for reconsideration of prior decision.

Defendant opines that the search of his premises was unlawful because it was made pursuant to a warrant that failed to particularly describe the premises as required by the Fourth Amendment of the United States Constitution, and Article 1, Section 8 of the Pennsylvania Constitution, and the Pennsylvania Rules of Criminal Procedure.

Constitutional restraints pertaining to search warrants mandate that the warrant normally contain a particular description of the premises which

is the subject of the search.[1] The Fourth Amendment[2] to the Federal Constitution provides that:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonble searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, *and particularly describing the place to be searched* and the persons or things to be seized. (Emphasis added.)

Article 1, Section 8 of the Pennsylvania Constitution provides:

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or seize any person or things shall issue *without describing or nearly as may be,* not without probable cause, supported by oath or affirmation subscribed to by the affiant. (Emphasis added.)

Defendant, in advancing his argument, likens the Sigma Phi Epsilon House to a hotel, motel, or even a rooming house. In accordance with the constitutional mandate that search warrants contain a precise description of the premise which is to be searched, a warrant authorizing the search of a multiple occupancy dwelling must usually adequately describe the sub-unit. Commonwealth v. Smyser, 205 Pa. Super. 599, 211 A. 2d 59 (1965). Admittedly, a fraternity house bears some resemblance to a hotel or motel, but more so, to a rooming house.

---

1. See also Am Jur, Searches & Seizures (1st ed. §34).

2. The Fourth Amendment is enforceable against the states through the due process clause of the Fourteenth Amendment.

The dictionary[3] defines a hotel as an establishment that provides lodging and usually meals, entertainment, and various personal services for the public while a motel is defined as an establishment which provides lodging and parking and in which the rooms are usually accessible from an outdoor parking area. A rooming house is defined as a house where lodgings are provided and let. Moreover, the same authority defines a fraternity as an organization designed for a common purpose, interest or pleasure, or the quality or state of being brothers; Brotherliness: men of same class, profession, character or taste.

Obviously, a fraternity house is more akin to a rooming house or lodging house than to a hotel or motel, where the similarities are minimal at best. However, patent dissimilarities exist between rooming houses and fraternity houses. In many instances, the occupants of lodgings or rooming houses have nothing in common except the bathroom. However, as is true here, the common areas extend to a television room, a dance room, a barroom, and bathroom facilities. Of even more telling consequence to the ultimate issues in the case *subjudice* is the brotherhood that exists within the fraternity. Additionally, the Administration of the Sigma Phi Epsilon Fraternity House was governed by a structured polity as evidenced by the fact that within the group there existed a president.

In light of this background, can defendant complain that the warrant did not describe the area to be searched with sufficient particularity.

Of significance here are the existent facts. The information given to the affiant by the informant was that she was brought to the Sigma Phi Epsilon

---

3. Websters New Collegiate Dictionary.

Fraternity House; that she socialized in the first floor bathroom; that she subsequently recalls being on the second floor of the fraternity house with about six males;[4] that in the early morning hours she became aware of being in bed with several males; that while she was on the second floor she smoked marijuana with the other male actors and that when the supply diminished a new supply was immediately procured from an unknown location on the premises; and that she was of the opinion that she was "slipped" drugs other than marijuana, since, because of past marijuana use, she was aware of the physical effects which were different than the "high" which she experienced while in the Fraternity House.

Admittedly, the search warrant here was directed against a multiple-occupancy structure. In his room Mr. Frengel had a refrigerator, a hot plate, his bed and the room was secured by locks. His personal facilities were apparently self-sufficient, except for bathroom facilities. Premised on these facts alone, and consonant with the constitutional mandate that search warrants contain a particular description of the premises to be searched, the rights of defendant were violated. However, humble or unpretentious, a home is a home.

However, there exists here another consideration in that the entire premises, and not a particular sub-unit, was under suspicion of illegal activity. A search warrant was held not to be invalid although it was directed against a multi-occupancy structure and no particular sub-unit was specified in that the entire premises rather than a particular sub-unit was under suspicion of illegal activity in the case of

---

4. There apparently was a total of 15 residents in the fraternity house.

State v. Ellis, 263 SC 12, 207 SE 2d 408, citing 11 A.L.R. 3d at 1343.

Here, Officer Hanna was as particular as possible under the given set of circumstances. The informant had supplied him with information regarding crimes involving sexual abuse and illegal drug use. Somewhere within the fraternity house the drugs were obtained; and the affiant was not given sufficient information to limit the search to a particular and precise location within the dwelling. Granted, the same limited information may not have reasonably justified a complete search of a multi-unit hotel or motel or even a sub-unit of a rooming house. But here, the house was small, accomodating 15 people; but, of greater significance was the fact that the residents shared both a common bond of fraternalism as well as common physical areas within the dwelling, viz., television room, dance room, barroom, and bathroom facilities. Of equal significance is that the other items sought by the issuance of the warrant, i.e., the victim's blue bikini style panties, the briefs, and the belt could have been located anywhere in the dwelling house, including the bedrooms of the residents as well as the common areas. And likewise, when the supply of marijuana was exhausted a new source was utilized to replenish the need from an unknown location somewhere on the premises.

Since the entire premises were under suspect it was impossible for the affiant, Officer Hanna, to particularize a specific portion of the fraternity house. His alternatives were to either name the entire premises or to venture a guess as to what portion of the house he should search in his quest to locate the requested items.

Was the course which he decided upon reasonable?

No hard and fast rule can apply; again, each case should be reasoned out on its own set of facts as established by the evidence. Here, the multi-unit dwelling was comparatively small, accomodating 15 residents; there existed numerous common areas such as the kitchen, bathroom, dance floor and the television room; additionally, a fraternal bond existed among the occupants, who, as a group, were apparently living in the dwelling as a unit (albeit not a family) who were directed in some degree by an organized system as evidenced by the existence of a fraternity president, and finally, at least six individuals were involved in the incident, and possibly more in that illegal contraband was obtained from somewhere on the premises.

Bottomed upon these facts, the issuance of the search warrant was valid even though no particular sub-unit was specified since the entire premises, rather than a particular sub-unit, was under suspicion of illegal activity.

## ORDER

Now, October 20, 1982, in conformity with the memorandum opinion filed herewith, defendant's motion to suppress evidence is hereby denied.

